# United States Court of Appeals
## For the First Circuit

No. 12-2219

UNITED STATES OF AMERICA,

Appellee,

v.

RAYMOND MARTINEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Howard and Kayatta, <u>Circuit Judges</u>,
and McCafferty,[*] <u>District Judge</u>.

<u>William W. Fick</u> for appellant.
<u>Mark T. Quinlivan</u>, Assistant United States Attorney, with whom
<u>Carmen M. Ortiz</u>, United States Attorney, was on brief, for
appellee.

August 6, 2014

[*] Of the District of New Hampshire, sitting by designation.

**KAYATTA, Circuit Judge**.  After the district court denied his motion to suppress evidence of a firearm found on his person, appellant Raymond Martinez entered a conditional guilty plea on one count of possessing a firearm as a convicted felon, see 18 U.S.C. § 922(g)(1), reserving the right to appeal the suppression ruling. See Fed. R. Crim. P. 11(a)(2).  He now appeals that ruling, as well as the district court's application of a six-level sentence enhancement based on a finding that his prior Massachusetts conviction for assault and battery constituted a "crime of violence" under the Sentencing Guidelines.  Though we affirm the denial of the suppression motion, we vacate Martinez's sentence and remand for further proceedings.

## I.  Background

After holding two evidentiary hearings on Martinez's motion to suppress, the district court issued the following findings of fact, which remain largely unchallenged on appeal.  On April 10, 2011, two members of the "Latin Kings" street gang were shot to death as they sat in a car in Worcester, Massachusetts. The wake for one of the victims was scheduled to take place at a church in Framingham, Massachusetts, at 4:00 PM on April 14, 2011. Framingham police officer Robert Lewis informed other officers of the wake at roll call before their 4:00 PM shift on April 14 and advised them that there was a heightened risk for gang violence in the area.  The Framingham Police Department assigned Lewis, along

-2-

with Detective Matthew Gutwill and other Framingham law enforcement officers, to monitor the area around the church where the wake was held.

Soon after the wake concluded, Gutwill drove by nearby Roosevelt Park and observed a number of cars and people gathering there. The park was located close to an address where police believed that people who had attended the wake would congregate. Gutwill did not recognize as gang members any of the people he saw there. He did, however, relay his observation of the gathering to a dispatcher over the police radio, expressing concern that "something wasn't right."

Upon hearing of Gutwill's message to the dispatcher, Lewis drove to the park. There, he saw two marked police cars approach the park and a third, silver car leave abruptly, with its tires screeching. After the car ran a red light,[1] Lewis pulled it over, notified dispatch that he was conducting a traffic stop, and requested backup.

When he approached the car, Lewis observed four people inside. He recognized the front-seat passenger as Raymond Martinez, the appellant, whom he had met before and knew to be a

---

[1] There was conflicting testimony in the district court regarding whether the light was red, but the district court credited the testimony supporting the conclusion that it was. Neither party challenges that conclusion on appeal. See generally United States v. Anderson, 745 F.3d 593, 598 (1st Cir. 2014) (arguments not advanced on appeal are waived).

-3-

member of the "Bloods" street gang. Lewis also knew that Martinez had previously been charged with assault and battery and dangerous weapons offenses. Consequently, through the open, driver's-side window, Lewis instructed the car's occupants to keep their hands where he could see them. The backseat passengers put their hands on the backs of the headrests of the seats in front of them, and Martinez put his hands on the dashboard.

Lewis asked the driver for his license and registration. The driver said he had neither, but identified himself as Michael Tisme. Lewis recognized that name as belonging to a member of the "Bloods" gang. After being told Tisme's name, Lewis told Tisme that he smelled marijuana in the car. He then ordered Tisme to exit the vehicle to be placed under arrest.

At that time, Lewis saw Martinez pull his hands off the dashboard and reach toward his waist. Lewis yelled at Martinez to put his hands back on the dashboard, which he did. Lewis then conducted a pat search of Tisme and found a bag of marijuana in his pocket.

At this point, Gutwill arrived on the scene. Lewis warned Gutwill that Martinez appeared nervous and had been pulling his hands toward his waist, and asked Gutwill to watch Martinez. In the course of doing so, Gutwill observed Martinez again moving his hands off the dashboard toward his waist. All parties now agree that Martinez was moving his hands to his waist to reach a

-4-

phone, and that, at some point during the stop, he managed to place a twelve-second call while in the car with the other two passengers. The evidence is conflicting as to whether any officer actually saw the phone. The district court found that they did not.

Shortly thereafter, a third law enforcement officer, Sergeant Kathryn Esposito, arrived and heard Gutwill repeatedly ordering Martinez to keep his hands on the dashboard. Gutwill instructed Esposito to remove Martinez from the car because Martinez was reaching for his waistband. Esposito removed Martinez from the car, walked him to Gutwill's nearby vehicle, and ordered him to place his hands on the vehicle and spread his feet. She then asked if he had any weapons on him. When an answer was not forthcoming, she conducted a pat-frisk of him. As she started to search his waistband, Esposito noticed a hard object that felt like the butt of a gun. She asked Martinez, "What's this?," and when he again failed to respond, she told him not to move and then pulled the object--a loaded firearm--from his waistband. The officers then placed Tisme and Martinez in handcuffs.

Martinez was subsequently indicted for being a felon in possession of a firearm that had traveled in interstate commerce. See 18 U.S.C. § 922(g)(1). He moved to suppress the firearm on the ground that the officers had no reasonable suspicion that he was armed and dangerous when they frisked him. See Terry v. Ohio, 392

-5-

U.S. 1 (1968). When the district court denied that motion, Martinez entered a guilty plea conditioned on the right to appeal that ruling.

After Martinez's guilty plea, the Probation Office prepared a pre-sentence report ("PSR") in which it recommended a base offense level of 20. The recommendation rested on the conclusion that Martinez's 2010 Massachusetts conviction for assault and battery, see Mass. Gen. Laws ch. 265, § 13A, qualified as a "crime of violence" under the Sentencing Guidelines, see U.S.S.G. §§ 2K2.1(a)(4), 4B1.2(a). After Martinez timely objected to that conclusion, the district court held a hearing at which it found that, in the process of pleading guilty to the assault and battery charge in state court, Martinez had admitted facts that made clear that his conviction was for intentional, harmful assault and battery. The district court therefore concluded that the offense constituted a crime of violence, adopted the PSR's suggested base offense level of 20, and found that Martinez's Guidelines Sentencing Range was 70-87 months, rather than the 37-46 month range that would have governed had the "crime of violence" determination gone the other way. The district court then sentenced Martinez to 70 months in prison.

Martinez appeals both the denial of his suppression motion and his 70-month sentence. We have jurisdiction under 28 U.S.C. § 1291.

## II.  Analysis

We address the suppression motion first.  Finding that it was properly denied, we then discuss Martinez's sentence.

**A.   The district court did not err in concluding that the search of Martinez was supported by reasonable suspicion.**

Martinez attacks the district court's denial of his motion to suppress on both factual and legal grounds.  First, he argues that the district court clearly erred by crediting the officers' testimony that they genuinely believed that Martinez's hand movements were furtive and suspicious.  Second, he contends that even if the district court did not clearly err in its fact finding, the totality of the circumstances simply did not give rise to the sort of particularized suspicion necessary to support a pat-frisk under Terry v. Ohio, 392 U.S. 1 (1968).

**1.   The district court's finding that the officers believed that Martinez had reached for a gun was not clearly erroneous.**

We begin with Martinez's fact-based challenge.  On review of a motion to suppress, we review the district court's findings of fact and credibility determinations only for clear error.  United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011).  This deference "reflects our awareness that the trial judge, who hears the testimony, observes the witnesses' demeanor[,] and evaluates the facts first hand, sits in the best position to determine what actually happened."  United States v. Young, 105 F.3d 1, 5 (1st

-7-

Cir. 1997); see also United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). Reversal is appropriate "only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made." Brake, 666 F.3d at 804 (internal quotation marks omitted).

The record is uncontested that, contrary to instructions from the officers, Martinez repeatedly moved his hands to his waist. It is also clear that Martinez managed to place a twelve-second telephone call during the arrest. Beyond that, the record presents a classic swearing contest: Martinez and another individual who was in the car, Trinity Font, swear that the officers noticed that it was a phone for which Martinez was reaching; the officers swear they did not. Given the tense circumstance, which we discuss in more detail below, either story is plausible. And that is certainly enough to accept the district court's finding under the applicable standard of review. See, e.g., Zapata, 18 F.3d at 975. We therefore proceed on the basis of the facts as the district court found them.

### 2. The search of Martinez was supported by reasonable suspicion of criminal activity.

Martinez also contends that, even taking as given the district court's factual findings, the search was unconstitutional. In so arguing, Martinez suggests that Sergeant Esposito acted on the basis of "a mere hunch," rather than with the support of "articulable facts" giving rise to a reasonable suspicion of

criminal activity.  See, e.g., United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).  We review de novo the district court's contrary conclusion.  See United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).

In Terry v. Ohio, 392 U.S. 1, 27 (1968), the Supreme Court concluded that, under the Fourth Amendment to the United States Constitution, "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."  The Court continued, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Id.

Interpreting Terry in United States v. McGregor, 650 F.3d 813, 821-23 (1st Cir. 2011), we held that a pat-frisk for weapons was constitutional where officers had observed two men, one a known gang member with a criminal record, drive up to a hospital to which two other gang members who had been shot had been taken, leave at a high rate of speed with others, and appear "suspiciously nervous" as officers approached them.  On the basis of those facts, we were unwilling to "fault the [district court's] finding that the police actually and reasonably suspected that the [defendant] might be

armed--a suspicion resting on rational reasons, rather than pure gut feelings--which . . . justified a limited weapons search . . . ." Id. at 821.

So it is here, a fortiori. At the time of Martinez's detention, officers knew that a wake for a murdered member of the "Latin Kings" gang had taken place that evening, and were thus on patrol for gang violence in that area. They had observed the car in which Martinez was riding leave abruptly as soon as police cruisers arrived, running a red light in the process. Lewis had recognized Martinez as a member of the "Bloods" gang and as an individual who had previously been charged with dangerous weapons offenses and with assault and battery. When Tisme identified himself, Lewis had further recognized his name as belonging to a member of the "Bloods" gang. And with all this background in mind, officers watched Martinez repeatedly flout their orders to keep his hands on the dashboard, instead reaching toward his waist, as they attempted to complete Tisme's arrest. As in McGregor, police in a highly volatile situation relied not simply on gut feelings, but on objectively reasonable justifications for suspecting that an individual acting suspiciously during a traffic stop was armed and dangerous.

Martinez makes no attempt to distinguish McGregor, but instead points us to two other cases, United States v. Monteiro, 447 F.3d 39 (1st Cir. 2006), and United States v. McKoy, 428 F.3d

38 (1st Cir. 2005), which he suggests ought to govern our analysis. In Monteiro, we held that a seizure of a known gang member was impermissible under Terry where it was based only on a "minimally corroborated" tip that the defendant had been involved in a shooting six days earlier. 447 F.3d at 42-44. And in McKoy, we reversed the denial of a suppression motion, resting on the ground that "[i]t is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches towards the car's console when approached by the police, even in a high-crime neighborhood." 428 F.3d at 41.

We distinguished each of these cases in McGregor itself, and the grounds on which we did so apply with the same force here. Monteiro stressed "that the police had no reason to believe that either the driver or the passengers had been or were about to be criminally active when the stop occurred." See McGregor, 650 F.3d at 823 (citing Monteiro, 447 F.3d at 42-43). In McGregor, by contrast, the officers had "sensibly suspected that the [defendant] might be armed and bent on retaliating for the shooting," and "had reasonably grounded their suspicion [i]n a host of facts beyond the men's obvious nervousness." 650 F.3d at 823. A similar contrast between the reasonless suspicion in Monteiro and the officers' reliance on facts applies here: While the officers' reasonable suspicion of Martinez rested, permissibly, in part on his involvement in past crimes, additional, objective factors such as

-11-

the nature of the occasion, the reaction of a car full of gang members when a police car approached, and the refusal to keep hands visible all pointed toward a reasonable likelihood that Martinez was armed and potentially dangerous.

Nor does McKoy cast doubt on our conclusion. As we said in McGregor, McKoy "required suppression of evidence seized during a warrantless car search, holding that the police infringed the defendant's constitutional rights by bottoming their suspicion solely on his apparent nervousness and the area's dangerousness." See McGregor, 650 F.3d at 823 (citing McKoy, 428 F.3d at 40-41). Here, as we have explained, there was more.[2]

For the above reasons, we affirm the district court's denial of Martinez's motion to suppress.

---

[2] Martinez cryptically contends that once Tisme was arrested, "the police had no reasonable suspicion of criminal activity that would justify further investigative detention or Terry stop of the passengers." See Appellant's Br., at 14 & n.3. This argument is never developed at all in his brief, presumably because it would be such a stretch to say that a gang member who repeatedly reaches for his waist in contravention of direct orders from law enforcement during a constitutionally-permissible stop cannot be searched for weapons. See generally Terry, 392 U.S. at 10 (observing that "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess"). In any event, because the argument is so incomplete that we are unable to make out its contours, we decline to address it. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

-12-

**B.     The district court erred in concluding that Martinez's base offense level was 20.**

We turn now to Martinez's challenge to his sentence. Martinez argued unsuccessfully below, and now claims on appeal, that his base offense level should have been 14, rather than 20, because his 2010 conviction under the Massachusetts Assault and Battery statute did not constitute a "crime of violence" under the Sentencing Guidelines. See U.S.S.G. §§ 2K2.1(a)(4), 4B1.2(a). The government defends the district court's contrary conclusion and further argues that an additional conviction of Martinez's, under the Massachusetts statute criminalizing simple assault, also qualifies as a crime of violence, and thus provides an alternative avenue by which we may affirm the sentence. Finding that neither offense so qualifies, we vacate Martinez's sentence and remand for further proceedings.

**1.     Martinez's Massachusetts assault and battery conviction**

The question of whether an offense qualifies as a crime of violence is a quintessentially legal one, and our review is de novo. See United States v. Jonas, 689 F.3d 83, 86 (1st Cir. 2012). Under the Guidelines, an offense qualifies if it is punishable by more than one year of imprisonment and either "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another," or "(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical

-13-

injury to another."  U.S.S.G. § 4B1.2(a).[3]  As we have explained in detail elsewhere, we apply this standard employing a "categorical" approach: A state offense qualifies as a crime of violence only if its elements are such that we can conclude that a person convicted of the offense has "necessarily" been found guilty of conduct that meets the above definition.  Descamps v. United States, 133 S. Ct. 2276, 2283 (2013) (internal quotation marks omitted); see also United States v. Fish, No. 12-1791, 2014 WL 715785, at *2-12 (1st Cir. Feb. 26, 2014).  And notwithstanding the absence of Sixth Amendment constraints in the context of Guidelines calculations, we have previously determined that the categorical approach, for all its "anomalous" results, applies fully to the determination of whether a prior offense constitutes a crime of violence under the Guidelines.  See United States v. Giggey, 551 F.3d 27, 38-41 (1st Cir. 2008) (en banc).

"Massachusetts's simple assault and battery statute[] covers . . . three types of battery: (1) harmful battery; (2) offensive battery; and (3) reckless battery."  See United States v.

---

[3]  We have elsewhere observed that this definition is "nearly identical in meaning" to that of the term "violent felony" in the Armed Career Criminal Act, 18 U.S.C. § 924(e)(ii)(B).  See, e.g., United States v. Holloway, 630 F.3d 252, 254 n.1, 262 (1st Cir. 2011); see also United States v. Willings, 588 F.3d 56, 58 n.2 (1st Cir. 2009).  Though the meanings of the two terms are "not quite[] the same," see United States v. Fish, No. 12-1791, 2014 WL 715785, at *2-12 (1st Cir. Feb. 26, 2014), both parties seem to assume that cases interpreting one are, in the context of this case, equally applicable to the other.  Hearing no protest, we "refer to both bodies of jurisprudence seamlessly."  Jonas, 689 F.3d at 86.

<u>Holloway</u>, 630 F.3d 252, 256 (1st Cir. 2011). Martinez argues on appeal that, for two separate reasons, simple assault and battery under Massachusetts law is not necessarily a crime of violence: First, offensive battery does not necessarily involve violent physical force, <u>see</u> <u>id.</u> at 261; <u>Johnson</u> v. <u>United States</u>, 559 U.S. 133, 140 (2010) (" . . . the phrase 'physical force' means <u>violent</u> force--that is, force capable of causing physical pain or injury to another person."); and second, reckless battery does not necessarily involve the degree of intent required under the guidelines.[4] Apparently conceding these points, the government argues only that Martinez pleaded guilty specifically to harmful battery. That form of the offense requires both an intentional touching and violent force, <u>see</u> <u>Commonwealth</u> v. <u>Porro</u>, 458 Mass. 526, 529-30 (2010), and all agree that it qualifies as a crime of violence under the Guidelines, <u>see</u> <u>Holloway</u>, 630 F.3d at 257, 262 (2009); <u>see generally</u> U.S.S.G. § 4B1.2(a)(1).

To support its contention that the 2010 conviction was for harmful battery, the government relies solely on the transcript of Martinez's 2010 allocution. <u>See generally</u> <u>Shepard</u> v. <u>United States</u>, 544 U.S. 13, 16 (2005) (holding that a sentencing court attempting to identify a crime of conviction is "generally limited

---

[4] Martinez makes no argument that the Massachusetts assault and battery offense, which falls under a single statute that does not list alternative elements, is in fact not divisible into three separate offenses. <u>See</u> <u>United States</u> v. <u>Anderson</u>, 745 F.3d 593, 598 (1st Cir. 2014). We express no opinion on the matter.

to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented"). Specifically, it argues that the transcript shows that in the course of pleading guilty, Martinez admitted to facts that made clear that harmful battery was in fact the offense of conviction. The portion on which the government relies reads as follows:

> THE COURT: And the facts of the case?
>
> ASSISTANT DISTRICT ATTORNEY: Your Honor, on February 12, 2009[,] officers of the Hudson police department were dispatched to 86 Apsley Street, Apartment 4 for report of assault and battery. Upon arrival they did speak with an [individual]. She stated that she had gotten into an argument with her boyfriend Raymond Martinez and that he had struck her during the course of that argument. Those are the facts of the case, Your Honor.
>
> . . .
>
> THE COURT: You admit that you committed the offense just described by the DA?
>
> THE DEFENDANT: Yes, sir.

The government makes no argument that the actual offense charged included intent (or even violent force) as a necessary element. Nor did Martinez admit in so many words that he intentionally struck his girlfriend. The government, though, argues that when he admitted that he "struck" his girlfriend, Martinez necessarily admitted that he intentionally struck her.

-16-

Certainly the word struck can be used in a manner that connotates intentional conduct. One of the definitions of "to strike" is "to deliver or aim a stroke, blow, or thrust." Webster's Third New International Dictionary of the English Language 2262 (2002). And we do not doubt that, without analysis, one might presume that an admission that one "struck" another with enough force to cause injury would be an admission to harmful battery. Indeed, in an earlier case, we observed that a PSR stating that a defendant had "struck" an individual "above the left eye, tearing the skin and causing it to bleed heavily," would, if the PSR could be relied upon, "almost certainly be sufficient to show" harmful battery. See United States v. Davis, 676 F.3d 3, 9 & n.5 (1st Cir. 2012).

That observation in Davis, presented as an aside in a footnote, was plainly dictum. In substance, it was entirely unnecessary to the holding, which was that the defendant had made no showing of prejudice stemming from reliance on the PSR, because he did not argue, even on appeal, that his prior conviction was not for the harmful type of assault and battery. Id. at 9-10. As dictum, the observation warrants our careful consideration, but does not control the results of that consideration. See, e.g., Diaz-Rodríguez v. Pep Boys Corp., 410 F.3d 56, 61 (1st Cir. 2005). Indeed, even were the quoted observation in Davis not dictum, it might well not control our decision here, because the standard

-17-

referred to in Davis ("almost certainly") is likely no longer the correct standard.  See Descamps, 133 S. Ct. at 2283 (making clear that the question in cases such as this one is whether an earlier conviction reveals that a defendant is "necessarily . . . guilty" of a crime meeting the recidivist statute's requirements (internal quotation marks omitted)).  In any event, whether the standard applied in Davis was correct or not, we are unable, with the benefit of full briefing and an opportunity to consider the question when its answer makes a difference, to agree that the verb "to strike" necessarily (or even "almost certainly") describes the intentional causing of contact.  As early as 1894, the reporter of decisions at Massachusetts's Supreme Judicial Court ("the SJC") described a case in which "detached cars were in charge of a brakeman, who was on the top of the car which struck plaintiff's intestate, and this brakeman called out to the plaintiff's intestate, to 'look out,' just before he was struck, but not in time to prevent the accident."  Keene v. New England Mut. Acc. Ass'n, 161 Mass. 149, 149 (1894).  The usage of "struck" to describe accidental conduct has persisted: For example, when we read that a pedestrian was struck in a crosswalk, we certainly do not presume the striking was intended.  E.g., Kelleher v. American Mut. Ins. Co. of Boston, 32 Mass. App. Ct. 501 (1992).  And in myriad other contexts, common usage makes abundantly clear that the verb "to strike" warrants a state-of-mind qualifier without

-18-

creating redundancy.  See, e.g., Johnson v. United States, 559 U.S. 133, 136-37 (2010) (specifying that the Florida assault and battery statute permits conviction if the state proves that the defendant "'intentionally struck' the victim" (internal citations and alterations omitted)); Roderick v. Brandy Hill Co., 36 Mass. App. Ct. 948, 949 (1994) (describing an assault in which the offender "had obtained [a] stick from the wooded area adjacent to the playground just before he struck [the victim] accidentally in the eye with it"); see also Charles Dickens, The Old Curiosity Shop 409 (Oxford Univ. Press) (1987) ("There are chords in the human heart--strange, varying strings--which are only struck by accident; which will remain mute and senseless to appeals the most passionate and earnest, and respond at last to the slightest casual touch."). Even the very dictionary on which the government relies provides a definition of "to strike" that includes no intent.  See Webster's Third New International Dictionary of the English Language 2262 (2002) (" . . . to come into contact or collision . . . ").

It is therefore no surprise that one of our sister circuits has, in a closely analogous case, found that the admission of "striking" was not an admission of intentional striking for purposes of the Guidelines.  See United States v. McFalls, 592 F.3d 707, 717 (6th Cir. 2010).  Faced with an earlier conviction in which the indictment had charged the defendant with "striking the victim about the face with an unknown object, in that the victim

-19-

required medical treatment," the Sixth Circuit held that the document did "not clearly answer the question of whether" the defendant "acted purposefully or knowingly in causing . . . injury." Id. This was so even though the indictment alleged that the assault and battery had caused an "unlawful injury to the person of said victim," and despite the further allegation that the "strik[e]" was "accompanied by circumstances of aggravation." Id.

Perhaps prepared for our conclusion that the word "struck" does not mean "intentionally struck," the government argues that even if the ordinary meaning of "struck" implies no scienter, "the district court could reasonably conclude" that, in the context of a domestic dispute, the word necessarily referred to a purposeful act on Martinez's part. We do not see this argument as having the force claimed by the government. As an initial matter, the government's focus on what the district court "could reasonably conclude from the guilty plea hearing" is a red herring: as the government concedes, see Government's Br., at 26, our review is de novo. Moreover, we find no support in law, logic, or common experience for the notion that all or even most all striking in a domestic dispute is intentional. To the contrary, it may well be that heated argument is conducive to close encounters and reckless gesticulation in a manner that other situations giving rise to contact are not.

So, when Martinez admitted that he struck his girlfriend in what the government describes as a domestic dispute, was he admitting that he intentionally struck her, or that he accidentally, negligently, or even recklessly struck her? No Shepard document answers this question. Nor would it make any difference if we thought that Martinez, a gang member who carried a gun and had obvious issues with authority, "most likely" committed intentional battery. Rather, what is important is whether Martinez's assent to the use of the word "struck"--either alone or in conjunction with the context in which it was used-- actually necessitates the finding that he admitted to conduct that was both intentional and physically violent. See Descamps, 133 S. Ct. at 2284 ("[A] conviction based on a guilty plea can qualify . . . only if the defendant 'necessarily admitted [the] elements of the [qualifying] offense.'" (quoting Shepard, 544 U.S. at 26)). Clearly it does not.

To summarize: Martinez admitted that he "struck" a person. Such a striking can occur without intent, as when a drunk driver strikes a pedestrian, or a gesticulating berater swings recklessly. The government must therefore argue that, based on the circumstances, the striking to which Martinez admitted was both intentional and forceful. Yet no Shepard document shows that Martinez confessed to such an added gloss. Nor does logic or experience compel such a reading of his confession. And no

-21-

precedent authorizes us to disregard real, non-hypothetical unintentional conduct that could very well have given rise to a conviction or plea. Therefore, we cannot say with the required certainty that he has been convicted of an offense that has the required element of intent to qualify as a crime of violence.[5]

## 2. Simple assault

The government further argues that, notwithstanding our conclusion as to Martinez's assault and battery offense, we may affirm on the alternative ground that a separate 2009 conviction for simple assault, see Mass. Gen. Laws ch. 265, § 13A, qualified as a crime of violence. In particular, the government contends that the crime of simple assault is defined in Massachusetts "as either an attempt to use physical force on another, or as a threat of use of physical force." See Commonwealth v. Gorassi, 432 Mass. 244, 248 (2000). The argument, in short, is that the elements of simple assault, unlike the elements of simple assault and battery,

---

[5] Because we find no adequate proof that Martinez admitted to purposeful conduct, we have no need to decide whether the conduct was violent within the meaning of the Guidelines. Nor need we reach the perhaps more difficult question of whether, when the elements of two or more offenses are not truly "alternative," e.g., Descamps, 133 S. Ct. at 2283-84, but instead overlap, a plea colloquy in which a defendant admits to facts that might have given rise to a conviction under more than one of them nevertheless permits a sentencing court to conclude that the admissions were legally necessary components of a plea to a more serious charge, rather than extraneous factual admissions offered in the course of a plea on an overlapping, perhaps lesser charge.

require the type of intent that is necessary to qualify an offense as a crime of violence under section 4B1.2(a)(1).[6]

The problem for the government is that the Guidelines also require "physical force," which has been defined as "<u>violent</u> force," <u>see</u> <u>United States</u> v. <u>Jonas</u>, 689 F.3d 83, 86 (1st Cir. 2012) (emphasis added)--"that is, force capable of causing physical pain or injury to another person." <u>See</u> <u>United States</u> v. <u>Johnson</u>, 559 U.S. 133, 140 (2010); <u>Fish</u>, 2014 WL 715785, at *6 (holding that "since [assault and battery with a dangerous weapon, under the Massachusetts statute,] may be accomplished by a mere touching, however slight, it does not have as an element the use of physical force" (internal quotation marks omitted)). By contrast, the SJC held in 1983 that the "physical force" that suffices under the Massachusetts assault statute may be a "mere touching." <u>See</u> <u>Commonwealth</u> v. <u>Burke</u>, 390 Mass. 480, 482-83 (1983).

The government concedes that the Guidelines standard requires violent force. It argues, however, that Massachusetts has more recently limited the scope of the assault offense to conduct involving violent force. Specifically, it points us to <u>Commonwealth</u> v. <u>Marinho</u>, 464 Mass. 115, 131 n.24 (2013), in which the SJC stated in dictum that "[t]he alternative elements of simple assault in Massachusetts--the attempted or threatened use of

---

[6] Perhaps wisely, <u>see</u> <u>United States</u> v. <u>Fish</u>, 2014 WL 715785, at *6-12 (1st Cir. Feb. 26, 2014), the government declines to argue that the offense qualifies under section 4B1.2(a)(2).

physical force against the person of another, see Commonwealth v. Gorassi, 432 Mass. 244, 248 (2000)--mirror the definition of 'crime[s] of violence' under Federal statute."[7]  And it further relies on Gorassi itself, the case on which the Marinho court relied, in which, again in dictum, the SJC suggested that "[i]n the case of an attempted battery type of assault . . . the Commonwealth must prove that the defendant attempted to do bodily harm."  432 Mass. at 248.

The government's claim that mere offensive touching no longer suffices to support a conviction for simple assault in Massachusetts nevertheless appears at best premature.  For example, side-by-side with the quotation above, the Gorassi court approvingly cited its earlier decision in Burke for the proposition that "criminal battery is a harmful or offensive touching," and made clear that an assault is either an attempted battery or a threatened one.  See 432 Mass. at 347 (cited in Gorassi, 432 Mass. at 247).  Gorassi also relied on the SJC's earlier opinion in Commonwealth v. Delgado, 367 Mass. 432, 437 (1975), in which the SJC explicitly endorsed the definition of assault found in the Restatement (Second) of Torts: "[w]ords do not make the actor liable for assault unless together with other acts or circumstances

_____

[7]  Though we defer to the SJC's construction of state offenses, see, e.g., Fish, 2014 WL 715785, at *14, the ultimate determination of whether an offense so construed qualifies as a "crime of violence" under the Guidelines is of course a matter of federal law, see id.

they put the other in reasonable apprehension of an imminent harmful <u>or</u> offensive contact with his person."  367 Mass. at 437 n.3 (emphasis added).  And even more recently, the SJC again confirmed that a threat of slight touching, if merely offensive, is sufficient to establish a threatened battery, and thus an assault. See <u>Commonwealth</u> v. <u>Porro</u>, 458 Mass. 526, 529-31 (2010).  At the time when Martinez was convicted, only one Massachusetts case, <u>Gorassi</u>, ran against this tide.

In short, although the SJC has occasionally suggested in dictum that the offense of assault might require a threat or attempt to cause physical harm, rather than mere offensive touching, it has never repudiated either the principle that assault is attempted or threatened battery or the principle that battery does not require violent force.  In the face of such ambiguity, we are constrained to conclude that the Massachusetts assault statute criminalizes all that the SJC has said it criminalizes, including mere touching if offensive.  We therefore conclude that the Massachusetts assault statute does not constitute a crime of violence under section 4B1.2 of the Sentencing Guidelines, and consequently, that the district court improperly calculated Martinez's base offense level.

*     *     *

In ruling that the government has not shown that Martinez was previously convicted of a crime of violence as defined in the

Guidelines, we are aware that a full exploration of the facts underlying Martinez's prior convictions might well reveal that his conduct has truly been violent by any measure. But as to each offense, the government asks us to resolve serious, lingering doubts in its favor and against the defendant, by relying on hunches as to what we think Martinez actually did. The Supreme Court, wary of such forays beyond the narrow scope of defining the elements of an offense, has demanded substantially more certainty in the application of the categorical approach than the government's analysis can afford. See, e.g., Taylor v. United States, 495 U.S. 575, 599-600 (1990). For that reason, and for others here identified, we observe quite simply that where state law and the Shepard documents leave open a plausible and realistic possibility that the defendant's prior conviction was for an offense whose elements do not meet the applicable definition of recidivist conduct, we cannot simply presume that the actual conduct qualified.

### III.  Conclusion

For the foregoing reasons, we affirm Martinez's conviction, vacate the district court's order sentencing him, and remand for further proceedings consistent with this opinion. So ordered.