## COMMONWEALTH *vs.* ALESSANDRO M. MARINHO.

Barnstable. September 4, 2012. - January 14, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Assault and Battery. Evidence,* Exculpatory. *Practice, Criminal,* Loss of
evidence by prosecution, Instructions to jury, Assistance of counsel, Plea.
*Due Process of Law,* Loss of evidence by prosecution, Assistance of counsel.
*Constitutional Law,* Assistance of counsel. *Alien. Words,* "Serious bodily
injury."

At the trial of a criminal complaint charging the defendant with assault and
battery causing serious bodily injury in violation of G. L. c. 265, § 13A
(*b*), the judge did not err in denying the defendant's motion for a required
finding of not guilty, where the evidence, although conflicting, was suf-
ficient to establish both that the victim's injuries, which resulted in significant
and lasting vision impairment, were "serious" within the meaning of that
statute [117-119], and that the defendant, and not the codefendant, had
caused the victim's injuries [119-120].

A District Court judge did not err in denying a defendant's motion to dismiss
the criminal complaint against him based on the Commonwealth's loss of
allegedly exculpatory evidence, where the defendant failed to meet his
threshold burden of proving that the evidence in question was in fact
exculpatory. [120-121]

At a criminal trial involving two defendants, the judge's instructions to the
jury regarding multiple defendants correctly conveyed the law. [121-122]

A District Court judge did not abuse his discretion in denying a criminal
defendant's motion for a new trial, in which the defendant alleged ineffec-
tive assistance of trial counsel, where, although counsel's performance was
deficient in three respects — namely, his failure to inform the defendant, a
noncitizen client, that conviction at trial could carry immigration
consequences; his failure to discuss the possibility of a plea resolution with
the defendant; and his failure to advocate for a lesser sentence — the
evidence offered by the defendant as proof of prejudice merely reflected
counsel's purported failures and did not establish that better work might
have accomplished something material for the defense. [122-133] DUFFLY,
J., concurring in part and dissenting in part.

COMPLAINT received and sworn to in the Orleans Division of
the District Court Department on February 12, 2009.

The case was tried before *Brian R. Merrick,* J., and a motion
for a new trial was heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Amy M. Belger* for the defendant.

*Elizabeth Sweeney*, Assistant District Attorney, for the Commonwealth.

*Jennifer Klein, Wendy Wayne, & Jeanette Kain*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

SPINA, J. On February 17, 2010, a jury in the District Court convicted the defendant, Alessandro M. Marinho, and a codefendant, Justin Parietti, each of one count of assault and battery causing serious bodily injury pursuant to G. L. c. 265, § 13A (*b*). The defendant was acquitted of assault and battery with a dangerous weapon pursuant to G. L. c. 265, § 15A (*b*).[1] He was sentenced to two and one-half years in a house of correction, nine months to serve with the balance suspended.

The defendant filed a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), alleging ineffective assistance of counsel for his lawyer's failure (1) to advise him of the immigration consequences of an assault and battery conviction, (2) to explore a plea resolution, and (3) to advocate for a sentence that might have mitigated such immigration consequences. The motion was denied following a nonevidentiary hearing. The defendant filed timely appeals from both the conviction and the denial of his motion for a new trial. We transferred the case here on our own motion.

The defendant alleges error in (1) the denial of his motion for a required finding of not guilty; (2) the denial of his motion to dismiss based on the loss of exculpatory evidence; (3) the judge's failure to instruct the jury on multiple defendants; and (4) the denial of his motion for a new trial.[2] We affirm the conviction and the order denying the defendant's motion for a new trial.

1. *Background.* The jury could have found the following facts. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). We reserve other details for discussion of specific issues.

---

[1] The alleged dangerous weapon was a boot or a "shod foot."

[2] We acknowledge the amicus brief of the Committee for Public Counsel Services.

On December 22, 2008, Sam Scherer and his girl friend, Jessica Cardinal, were at Cardinal's apartment in Wellfleet. Cardinal shared the apartment with Parietti, who lived in an upstairs room. In Parietti's room was a television that another man, Zack Store, owned and had left in the apartment.

That evening, Store went to the apartment and had a discussion with Scherer in which Store agreed to sell the television to Scherer. Store and Scherer retrieved the television from Parietti's room and installed it in the living room. Store left the apartment.

Shortly thereafter, Parietti arrived at the apartment with two friends, the defendant and Hunter Carwile. After Parietti saw that the television was no longer in his room, he and Scherer stepped outside and a physical fight ensued. Testimony about the particulars of the fight differed. Suffice it to say that the two men fell to the ground with Scherer positioned on top of Parietti.[3] Parietti began making choking sounds. The defendant entered the fray when Scherer was still on top of Parietti, and he began to fight Scherer. After the fight, Scherer was brought to Cape Cod Hospital but then was transported to Beth Israel Deaconess Medical Center. He had a fractured nose, cheekbones, and orbital (eye socket) bones. As a consequence of the fight, Scherer had reconstructive surgery on his face. His vision was affected by the altercation; he had double vision for three to four months after the assault, and his vision at the time of trial had not been restored to normal. The defendant is not a United States citizen and was in the United States illegally. At the time of this appeal, the defendant had been deported.

2. *Motion for a required finding of not guilty.* The defendant contends that the judge erred in denying his motion for a required finding of not guilty. Specifically, he argues that the evidence was insufficient to establish that (1) Scherer's injuries were "serious" within the meaning of G. L. c. 265, § 13A (*b*) (*i*), and (2) the defendant caused Scherer's injuries. The issue whether the evidence was sufficient to establish that Scherer's injuries were "serious" was preserved for appellate review by a timely objection at trial, and by the defendant's motion for a required

---

[3]Although Cardinal also was involved in the altercation and suffered injuries, her involvement is not relevant to this appeal. Carwile's involvement is also immaterial.

finding of not guilty. We thus review the denial of this aspect of the defendant's motion under the standard set forth in *Commonwealth* v. *Latimore, supra* at 677-678. The issue of the sufficiency of the evidence of causation was not preserved. We review this unpreserved error under the substantial risk of a miscarriage of justice standard. See *Commonwealth* v. *Melton,* 436 Mass. 291, 294 n.2 (2002).

In reviewing the sufficiency of the evidence, we must look at the evidence in a light most favorable to the Commonwealth to determine whether any rational jury could have found the essential elements beyond a reasonable doubt. *Commonwealth* v. *Latimore, supra* at 676-677. The Commonwealth need only present evidence that allows a jury to infer essential facts, *Commonwealth* v. *Merola,* 405 Mass. 529, 533 (1989), and the fact "[t]hat contradictory evidence exists is not a sufficient basis for granting a motion for a required finding of not guilty." *Commonwealth* v. *Merry,* 453 Mass. 653, 662 (2009). As the defendant had two reasons for contesting the denial of the motion for a required finding, we take each in turn.

a. *Serious bodily injury.* "[S]erious bodily injury" is defined as "bodily injury that results in a permanent disfigurement, loss or impairment of a bodily function, limb or organ, or a substantial risk of death." G. L. c. 265, § 13A (*c*). Loss or impairment of a bodily function need not be permanent to meet the definition of "serious bodily injury." See *Commonwealth* v. *Baro,* 73 Mass. App. Ct. 218, 219-220 (2008) (punches and kicks to head resulting in broken bones and temporary loss of sight for one and one-half months constitutes "serious bodily injury"); *Commonwealth* v. *Jean-Pierre,* 65 Mass. App. Ct. 162, 162, 164 (2005) (punches resulting in broken jaw and several weeks of tube-feeding constitutes "serious bodily injury").

The defendant argues that there was insufficient evidence that Scherer suffered loss or impairment of a bodily function, limb, or organ. He relies on the hospital records and claims that they offer no evidence of impairment to Scherer's vision. The defendant paints an incomplete picture of the evidence of Scherer's significant vision loss following the violent confrontation with the defendant. Although some of the medical records do not reflect that Scherer's vision was impaired, other records state

that Scherer presented with "blurred vision" and "vision changes." Scherer also testified to his impaired vision following the fight with Parietti and the defendant. He testified that he had to return to the hospital multiple times after undergoing facial reconstruction surgery to ensure that his vision kept improving. He stated that he experienced double vision for three or four months following the altercation and that he still was having trouble seeing at the time of trial, which was more than one year after the fight. This testimonial evidence of significant and lasting vision impairment, even if it conflicts with some of the medical records, indicates that Scherer's injuries were not — as the defendant suggests — mere "facial injuries resulting from a fistfight." To the contrary, the evidence was such that a reasonable jury could have found "serious bodily injury" within the meaning of G. L. c. 265, § 13A (*b*) (*i*).

b. *Whether the defendant caused Scherer's injuries.* The defendant also asserts that the judge erred in denying his motion for a required finding of not guilty because there was insufficient evidence to establish that the defendant's and not Parietti's actions caused Scherer's injuries. He suggests that the combination of the defendant's acquittal of assault and battery with a dangerous weapon and the fact that the defendant entered the fight after Parietti is such that no reasonable jury could have found the essential causation element.

At the close of all the evidence, the Commonwealth requested and the judge denied a joint venture jury instruction. Therefore, the burden was on the Commonwealth to prove causation beyond a reasonable doubt as to the defendant. Because the defendant did not preserve the causation issue, we review the denial of the motion to determine whether any error resulted in a substantial miscarriage of justice. *Commonwealth* v. *Melton, supra.* We conclude that there was none.

The Commonwealth may establish causation in an assault and battery case by proving beyond a reasonable doubt that the defendant either directly caused or "directly and substantially set in motion a chain of events that produced" the serious injury in a natural and continuous sequence. See Instruction 6.160 of the Criminal Model Jury Instructions for Use in the District Court (2009). Cf. *Commonwealth* v. *Smiley*, 431 Mass. 477, 489

n.9 (2000). The judge correctly instructed the jury on these methods of proving causation. Although the evidence of who did what to whom was conflicted, it did not thereby become insufficient. The jury could have found that the defendant caused serious injury (fractured orbital bones and double vision) to Scherer by kicking Scherer in the head while Scherer was holding Parietti on the ground, thereby rendering Scherer unconscious. The fact that the defendant was acquitted on the assault and battery with a dangerous weapon charge[4] does not disprove that there was direct contact attributable solely to the defendant.[5] Because there was sufficient evidence to support the jury's verdict, we conclude there was no error in the denial of the motion for a required finding of not guilty.

3. *Motion to dismiss based on the loss of exculpatory evidence.* The defendant asserts error in the denial of his motion to dismiss the complaint where the Commonwealth allegedly lost potentially exculpatory evidence, namely, a statement Scherer reportedly wrote following the altercation with Parietti and the defendant. The issue was preserved at trial. The basis for the motion was the testimony of a police officer who arrived on the scene following the altercation. He recalled reading Scherer's statement but was unsure what had become of it. He did not know whether Scherer had ever given the statement to the police or if the police had misplaced it. It was the defendant's position that any

---

[4]Because an issue at trial was the type of footwear the defendant was wearing, the jury could have acquitted him on the ground that the footwear did not constitute a deadly weapon.

[5]In the alternative, the jury could have found that the concurrent actions of Parietti and the defendant, both of whom landed blows on Scherer within a short period of time, caused Scherer's severe injuries. See *Commonwealth* v. *Perry*, 432 Mass. 214, 225-226, 229 (2000) (deciding that, although cumulative effect of multiple beatings caused victim's death, evidence was sufficient for jury to conclude that defendant caused victim's death on theory of individual liability); *Commonwealth* v. *McLeod*, 394 Mass. 727, 745, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985) (where there is more than one proximate cause, "liability . . . [is not required to] be related to any theory of joint liability"). In yet another alternative, although the judge did not instruct the jury on joint venture, joint venture was a viable theory at the time the Commonwealth rested; therefore, evidence supporting conviction on joint venture theory could be considered in determining the sufficiency of the evidence of causation. See *Commonwealth* v. *Mills*, 436 Mass. 387, 393 (2002).

discrepancies between the statement and Scherer's testimony would have undercut Scherer's credibility as a witness; therefore, the defendant claims, he was deprived of a meaningful opportunity for cross-examination by the Commonwealth's failure to produce the statement.

To state a claim that the government has lost or destroyed potentially exculpatory evidence, the defendant has the burden of establishing, based on concrete evidence, that there was a reasonable possibility that the allegedly lost statement would have supported his case. See *Commonwealth* v. *Williams*, 455 Mass. 706, 718 (2010). The trial judge then must "weigh the materiality of the evidence and the potential prejudice to the defendant, as well as the culpability of the Commonwealth and its agents." *Commonwealth* v. *Harwood*, 432 Mass. 290, 295 (2000). We, in turn, review the judge's determination for clear error. See *id.*

We conclude that the judge did not err in denying the motion to dismiss. The defendant presented no evidence whatsoever of the contents of the elusive statement. His claim that it would have been inconsistent, much less materially inconsistent, is speculative. Therefore, he did not meet his threshold burden of proving that the statement was exculpatory.[6]

4. *Failure to instruct the jury on multiple defendants.* The judge denied the Commonwealth's request to instruct the jury on joint venture.[7] The defendant alleges error in the judge's failure to use the model jury instruction applicable to cases with multiple defendants, and to his use of the singular "defendant" as opposed to the plural "defendants" in instructing the jury. The consequence, according to the defendant, was avoidable jury confusion as to which of the two defendants was responsible for each distinct act.

---

[6]Contrary to the defendant's argument, the judge did not usurp the jury's fact-finding prerogative in merely reflecting that he was "not so sure [the statement] did exist" when the police officer had testified the previous day that he read the report. The judge was not addressing the jury at the time and, thus, could not have invaded the jury's function. See *Commonwealth* v. *McColl*, 375 Mass. 316, 321 (1978). In addition, the judge did not remove from the jury's consideration any factual issues that the defendant was entitled to have the jury resolve.

[7]Counsel for Parietti, the codefendant, objected to the Commonwealth's request for a joint venture instruction. Counsel for the defendant did not.

We evaluate jury instructions as a whole and interpret them as would a reasonable juror. *Commonwealth* v. *Trapp*, 423 Mass. 356, 361, cert. denied, 519 U.S. 1045 (1996). We do not require that judges use particular words, but only that legal concepts are properly conveyed. *Id.* at 359. Because the defendant did not object to the jury instruction at trial, we review his claim to determine first whether there was error, and if so, we then inquire whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Belcher*, 446 Mass. 693, 696 (2006).

The defendant's argument is unpersuasive. In his instructions, the judge emphasized that each defendant faced distinct charges and differentiated between the charges against each individual defendant. Significantly, he instructed the jury that the "burden of the Commonwealth is to prove every single element of the charge against each defendant beyond a reasonable doubt." In so doing, the judge correctly conveyed the law. Because there was no error of law, there was no substantial miscarriage of justice.[8] See *Commonwealth* v. *Randolph*, 438 Mass. 290, 303 (2002).

*5. Denial of the motion for a new trial.* The defendant moved, pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), for a new trial on the ground that he was deprived of his right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. His counsel's alleged failings were many,[9] and they occurred at different stages of the litigation. Counsel's purported deficiencies included the failure (1) to advise the defendant prior to trial of the potential immigration consequences of an assault and battery conviction at trial, (2) to discuss the possibility of a plea resolution with the

---

[8]The defendant makes an additional argument that his defense counsel was ineffective in failing to request a jury instruction on how to evaluate a case with multiple defendants. Because there was no error of law giving rise to a substantial miscarriage of justice, there could not have been ineffective assistance of counsel. See *Commonwealth* v. *Emeny*, 463 Mass. 138, 153 (2012); *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

[9]In addition to the claims we discuss at greater length, the defendant also alleges that his counsel failed to prepare him to testify at trial and to inform him of the elements of the charged offenses and relevant defenses. The trial transcript does not indicate lack of preparedness.

defendant, and (3) to advocate for a sentence that might have mitigated the immigration consequences of a conviction.

A hearing on the motion was held in June, 2012, after which the motion was denied. We review the denial of the motion for abuse of discretion. See *Commonwealth* v. *Lucien*, 440 Mass. 658, 670 (2004). A defendant bears the burden of proof on a motion for a new trial,[10] see *Commonwealth* v. *Watson*, 455 Mass. 246, 256 (2009), and a judge is entitled to discredit affidavits he or she does not find credible, see *Commonwealth* v. *Grace*, 370 Mass. 746, 751-752 (1976), citing *Commonwealth* v. *Heffernan*, 350 Mass. 48, 53, cert. denied, 384 U.S. 960 (1966). We conclude that the judge did not abuse his discretion and affirm the order denying the motion for a new trial. We reach this conclusion because the defendant offered no proof that there was "a 'reasonable probability' that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Commonwealth* v. *Mahar*, 442 Mass. 11, 15 (2004), quoting *Strickland* v. *Washington*, 466 U.S. 668, 694 (1984). See *Missouri* v. *Frye*, 132 S. Ct. 1399, 1410 (2012) (*Frye*); *Lafler* v. *Cooper*, 132 S. Ct. 1376, 1385 (2012) (*Lafler*).

The two-part test a defendant must satisfy to prevail on a claim of ineffective assistance of counsel in Massachusetts is familiar. The defendant must show that counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," and that his performance "likely deprived the defendant of an otherwise available, substantial ground of defence."[11] *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974) (*Saferian*). Although the defendant's claim fails for lack of proof of prejudice, we consider whether defense

---

[10]The defendant and his trial attorney, who was not appellate counsel, submitted affidavits that attest to the defendant's claims. The codefendant's attorney and the assistant district attorney also submitted affidavits that indicate that the defendant's trial counsel would not engage in a plea negotiation.

[11]Satisfying *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974) (*Saferian*), necessarily satisfies the Federal standard articulated in *Strickland* v. *Washington*, 466 U.S. 668, 694 (1984), for evaluating the constitutional effectiveness of counsel. *Commonwealth* v. *Clarke*, 460 Mass. 30, 45 (2011) (*Clarke*). In fact, we "grant more expansive protections under [art. 12 of the Massachusetts Declaration of Rights] than have been required of States under the Sixth Amendment." *Commonwealth* v. *Rainwater*, 425 Mass. 540, 553 (1997), cert. denied, 522 U.S. 1095 (1998).

counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," *id.*, before we address the prejudice issue.

a. *Professional standards.* We consider defense counsel's performance under the first prong of *Saferian* in light of *Padilla* v. *Kentucky*, 130 S. Ct. 1473 (2010) (*Padilla*), a recent case in which the United States Supreme Court held that counsel must advise a defendant that a guilty plea may carry deportation consequences. In *Padilla, supra* at 1480, the Court chronicled the changes in immigration law that have led to an increase in deportable offenses and concluded that "deportation is an integral part — indeed, sometimes the most important part" — of the criminal process. Because of this intimate connection between the criminal process and deportation, the Court declined to regard deportation as a mere "collateral consequence" of criminal conviction. Underlying the Supreme Court's decision that deportation consequences are not "collateral" to the criminal justice process and thus not removed from a noncitizens' Sixth Amendment right to counsel is a deep appreciation of the "seriousness of deportation" for noncitizen defendants. *Id.* at 1486. Indeed, "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." *Id.* at 1483, quoting *Immigration & Naturalization Serv.* v. *St. Cyr*, 533 U.S. 289, 323 (2001). With the changed landscape following *Padilla* in mind, we briefly address each of counsel's alleged failings individually.

i. *Failure to advise defendant of immigration consequences of conviction at trial.* An initial issue in this appeal is whether the Supreme Court's holding in *Padilla, supra* at 1486, that defense counsel must advise noncitizen clients that pleading guilty may result in deportation, requires counsel to inform a noncitizen client that conviction at trial may similarly carry immigration consequences. We hold that it does. Although *Padilla* and its progeny, *Frye, supra*, and *Lafler, supra*, concerned the duties of counsel in the plea context, the language of *Padilla*, much of which this court acknowledged in *Commonwealth* v. *Clarke*, 460 Mass. 30, 42-46 (2011) (*Clarke*), implicates counsel's duties in the context of advice rendered to clients about immigration consequences more broadly. For example, the Court states

that counsel has an affirmative duty[12] to "advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences."[13] *Padilla, supra* at 1483. See *Clarke, supra* at 42. Such broad language suggests that *Padilla* imposes on defense counsel a duty to inform a noncitizen client that conviction, whether by plea or by trial, may carry adverse immigration consequences.[14] *Padilla, supra* at 1482-1483. *Clarke, supra.* Moreover, national guidelines[15] dictate "that counsel must advise her client regarding the risk of deportation," without specific reference to conviction by guilty plea. *Padilla, supra* at 1482, citing National Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Representation § 6.2 (1995). See J.W. Hall, Jr., Professional Responsibility in Criminal Defense Practice § 10:29 (3d ed. 2005) ("The failure to advise a defendant that he could be deported if convicted . . . would constitute ineffectiveness"). Similarly, the expectation in the Massachusetts legal community is that defense counsel should inform a client about immigration consequences associated with criminal conviction, however imposed. See Committee for Public Counsel Services, Assigned Counsel Manual c. 4, at 15 (rev. June 2011) (CPCS Manual) ("Counsel must also advise the client . . . of the consequences of a conviction, including . . . possible immigration consequences including but not limited to deporta-

---

[12]*Padilla* v. *Kentucky*, 130 S. Ct. 1473, 1484 (2012) (*Padilla*), makes plain that defense counsel has an affirmative duty to advise a noncitizen criminal client about the immigration consequences of involvement in the criminal justice system; a defense counsel who remains silent about potential immigration consequences fails to provide constitutionally effective counsel. See *Clarke, supra* at 43.

[13]In *Padilla, supra* at 1483, the precise immigration consequences of the noncitizen defendant's conviction of transporting marijuana were "succinct, clear, and explicit" and easily ascertainable "simply from reading the text of the statute." See 8 U.S.C. § 1227(a)(2)(B)(i) (2006). Therefore, the Court determined that defense counsel should have advised his client that conviction would result in deportation. The substantive adequacy of counsel's advice is not at issue in this case because the record indicates that defense counsel said nothing to the defendant about the immigration consequences of conviction.

[14]In the aftermath of *Padilla*, earlier characterizations of immigration consequences as "collateral" are no longer good law. See, e.g., *United States* v. *Fry*, 322 F.3d 1198, 1200 (9th Cir. 2003), and cases cited.

[15]Constitutional deficiency is "necessarily linked to the practice and expectations of the legal community." *Clarke, supra* at 42, quoting *Padilla, supra* at 1482.

tion, denial of naturalization or refusal of reentry into the United States").[16] Because "[i]t is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation," *Clarke, supra* at 46, quoting *Padilla, supra* at 1484, and the defense counsel in the present case failed to do so, we conclude that his performance fell "measurably below that which might be expected from an ordinary fallible lawyer." See *Saferian, supra.*

ii. *Failure to discuss plea resolution with defendant.*[17] *Padilla* is not directly applicable outside the context of defense counsel's duty to advise a noncitizen client that immigration consequences may flow from conviction, whether by plea or by trial. Immigration consequences may nevertheless factor into litigation strategy, including at plea and sentencing stages. That immigration consequences inform trial strategy is appropriate given the grave impact involvement with the criminal justice system can have on a noncitizen defendant's immigration status and the view, following *Padilla*, that immigration consequences like

---

[16]Although we are not bound by the Committee for Public Counsel Services's Assigned Counsel Manual (rev. June 2011) (CPCS Manual), we find it persuasive. We further note that the CPCS Manual governs the conduct of both assigned and appointed counsel. CPCS Manual, *supra* at c. 1, at 1.

[17]In his brief, the defendant often frames this allegation as counsel's failure to engage in plea negotiations with the prosecutor. We agree with the defendant that it is generally prudent practice for defense counsel to explore the possibility of a plea bargain, particularly in light of potentially severe immigration consequences of conviction. See, e.g., CPCS Manual, *supra* at c. 4, at 46. However, defense counsel does not have an absolute duty to engage in plea negotiations. See American Bar Association, Standards for Criminal Justice, Prosecution Function and Defense Function § 4-6.2, at 205 (3d ed. 1993) ("Plea discussions should be considered the norm and failure to seek such discussions is an exception *unless defense counsel concludes that sound reasons exist for not doing so*" [emphasis added]); G.N. Herman, Plea Bargaining § 3:03, at 21 (3d ed. 2012) ("for purposes of effective assistance of counsel, a defense attorney has no duty to enter into plea negotiations . . ."). Claims of ineffective assistance of counsel for failure to engage in plea negotiations have typically been rejected when defense counsel has a justifiable explanation for making the strategic decision not to explore a plea deal. See, e.g., *People v. Sherman*, 172 P.3d 911, 913 (Colo. Ct. App. 2006); *People v. Palmer*, 162 Ill. 2d 465, 478-479 (1994), cert. denied, 514 U.S. 1086 (1995). See also D. Kesselbrenner & W. Wayne, Defending Immigrants Partnership, Selected Immigration Consequences of Certain Massachusetts Offenses 3 (2006); Annot., Adequacy of Defense Counsel's Representation of Criminal Client Regarding Plea Bargaining, 8 A.L.R.4th 660, at § 2(a) (1981).

deportation are no longer collateral to conviction. With these ideas in mind, we turn to the defendant's two other claims of attorney error: that defense counsel failed to discuss the possibility of a plea resolution and to advocate for a sentence that might have mitigated the immigration consequences of a conviction. We "judge the reasonableness of counsel's challenged conduct on the facts of the particular case," *Clarke, supra* at 38, quoting *Strickland* v. *Washington*, 466 U.S. 668, 690 (1984), and "decline[] to define the constitutional obligations of counsel in more specific terms." *Clarke, supra.* See *Roe* v. *Flores-Ortega*, 528 U.S. 470, 479-480 (2000) (rejecting bright-line rules governing constitutional duties of counsel).

It is undisputed that a criminal defendant has no constitutional right to a plea bargain. *Lafler, supra* at 1395. Moreover, the prosecutor in the present case never put a formal plea offer on the table. Cf. *Frye, supra* at 1408-1409. Nevertheless, defense counsel should have informed the defendant that the prosecution was interested in discussing a plea resolution and proceeded to discuss that possibility with the defendant prior to trial. Today, "[p]leas account for nearly 95 [per cent] of all criminal convictions." *Padilla, supra* at 1485. It is standard practice that "the attorney should explore all alternatives to trial, including the possible resolution of the case through a negotiated plea or admission to sufficient facts." CPCS Manual, *supra* at c. 4, at 46. In the present case, defense counsel knew that the defendant faced possible deportation and yet failed to tell the defendant that the prosecutor twice approached him about the possibility of plea resolution. Thus, whether a plea was a real option or would have resulted in less severe immigration consequences, the defendant was deprived of the opportunity to make an intelligent decision, based on greater information, about whether to proceed to trial or to request that counsel engage in plea negotiations. See *Frye, supra*; Mass. R. Prof. C. 1.2, 426 Mass. 1310 (1998) (client's decision to accept plea); Mass. R. Prof. C. 1.4, 426 Mass. 1314 (1998) (client communication). For these reasons, counsel's performance was deficient.

iii. *Failure to advocate for lesser sentence.* We similarly conclude that counsel's failure to argue for a shorter sentence

fell measurably below requisite professional standards.[18] In *Padilla, supra* at 1486, the Supreme Court emphasized that criminal conviction may carry severe immigration consequences for a noncitizen criminal defendant and his family. We likewise appreciate the grave impact sentencing can have on deportability. For a noncitizen defendant, the difference between imposed sentences of 364 days and of one year following convictions of simple assault or aggravated assault and battery may be the difference between life in this country and deportation. See D. Kesselbrenner & W. Wayne, Defending Immigrants Partnership, Selected Immigration Consequences of Certain Massachusetts Offenses 3, 4 (2006) (Kesselbrenner & Wayne). Moreover, the standard practice for defense counsel in Massachusetts is to consider the immigration consequences that may attach to a sentence and to "zealously advocate the best possible disposition" for the client.[19] CPCS Manual, *supra* at c. 4, at 22-24. In failing to do so, counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer." *Saferian, supra.*

b. *Prejudice.* Having determined that counsel's performance failed to satisfy the first prong of *Saferian, supra,* we now reach the central reason for the disposition of this appeal: the defendant's failure to show that he was prejudiced by counsel's performance. We conclude that the defendant is not entitled to a new trial because he offers no proof of prejudice. In support of his argument that he was prejudiced by counsel's allegedly deficient performance, the defendant relies on his own affidavit,

---

[18]As we discuss later, we are disturbed by the dearth of proof of counsel's performance at sentencing.

[19]Reasoning that immigration consequences are collateral to conviction, this court has held that a trial judge should not consider the potential immigration consequences in fashioning a sentence. See *Commonwealth* v. *Quispe*, 433 Mass. 508, 513 (2001). This reasoning was undermined in *Padilla* when the Supreme Court declined to accept the view that immigration consequences are collateral to conviction. *Padilla, supra* at 1481. Therefore, our precedent that a trial judge cannot factor immigration consequences into sentencing is no longer good law. See *Commonwealth* v. *Quispe, supra* at 512-513. See, e.g., *United States* v. *Kwan*, 407 F.3d 1005, 1017 (9th Cir. 2005) (judge may factor immigration consequences into sentencing); *United States* v. *Castro*, 26 F.3d 557, 560 (5th Cir. 1994) (same). See also, e.g., Note, Extracting Compassion from Confusion: Sentencing Noncitizens after *United States v. Booker*, 79 Fordham L. Rev. 2129, 2156-2165 (2011).

as well as affidavits from his counsel, the codefendant's counsel, and the assistant district attorney. These affidavits merely reflect counsel's purported failures and do not establish that "better work might have accomplished something material for the defense." *Commonwealth* v. *Dargon*, 457 Mass. 387, 403 (2010), quoting *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

i. *Failure to advise defendant of immigration consequences of conviction.* The defendant argues that, had he known the potential immigration consequences of the charges, he would have requested that counsel engage in plea negotiations in an attempt to lessen the immigration consequences. He shows no specific prejudice from counsel's failure to inform him of the consequences of conviction at trial but, instead, relies on the other two areas of ineffectiveness to establish over-all prejudice.

ii. *Failure to discuss possibility of plea resolution with defendant.* To establish prejudice on account of counsel's deficient performance in the plea context, the defendant must show a reasonable probability that the result of a plea would have been more favorable than the outcome of the trial. See *Frye, supra* at 1409; *Lafler, supra* at 1385. In particular, the defendant must demonstrate a reasonable probability that the prosecution would have made an offer, that the defendant would have accepted it, and that the court would have approved it. See *Frye, supra* (concluding that defendant had not established prejudice because of "strong reason to doubt the prosecution and the trial court would have permitted the plea bargain to become final"); *Lafler, supra* ("defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed").[20] Moreover, "[p]roof of prejudice . . . cannot be based on mere conjecture or speculation as to outcome." *People*

[20]The dissent contends that the defendant was altogether denied the assistance of counsel at a critical plea negotiation stage of the proceedings. This, according to the dissent, is per se ineffective assistance of counsel for which no specific showing of prejudice is required. *Post* at 137-138, 144. The basis

v. *Palmer*, 162 Ill. 2d 465, 481 (1994), cert. denied, 514 U.S. 1086 (1995).

The affidavits submitted by the defendant merely state that defense counsel decided against engaging in a plea negotiation or discussing that option with the defendant. The defendant offered no evidence that the prosecutor would have offered him a favorable plea bargain, or that the judge would have accepted one. Evidence that there was no plea negotiation also does not establish that there was any real opportunity to avoid the immigration consequences of a conviction, particularly for an undocumented person. The reality of the defendant's status as an undocumented person living in the United States was that he was deportable per se on account of his unlawful status.[21] The

---

for this outcome is *Roe* v. *Flores-Ortega*, 528 U.S. 470, 483-484 (2000) (*Flores-Ortega*), a case involving counsel's failure to file a notice of appeal that resulted in the forfeiture, effectively a complete denial, of a judicial proceeding altogether.

The dissent's reliance on *Flores-Ortega* is misplaced. Although the right may be waived, see *Commonwealth* v. *Petetabella*, 459 Mass. 177, 181 (2011), criminal defendants in Massachusetts have a statutory right of appeal. G. L. c. 278, § 28. See *Commonwealth* v. *Cowie*, 404 Mass. 119, 122 (1989). Criminal defendants have no right to a plea bargain. *Lafler* v. *Cooper*, 132 S. Ct. 1376, 1395 (2012) (*Lafler*). Therefore, counsel's failure to discuss the possibility of a plea bargain did not deprive the defendant of any rights. Said differently, the defendant forfeited nothing. Moreover, in relying on *Flores-Ortega*, the dissent completely disregards the fact that both the Supreme Court and this court have required a showing of actual prejudice in analogous contexts. See *Missouri* v. *Frye*, 132 S. Ct. 1399, 1409 (2012) (lapsed plea); *Lafler*, *supra* at 1385 (rejected plea); *Clarke*, *supra* at 47-49 (uninformed guilty plea). See also *Padilla*, *supra* at 1487 (remanding for proceedings on actual prejudice). Courts in other jurisdictions that have considered the evidence necessary to satisfy the prejudice prong of an ineffective assistance claim in the context of counsel's failure to adequately explore a plea resolution similarly required a showing of actual prejudice. See, e.g., *United States* v. *Boone*, 62 F.3d 323, 327 (10th Cir.), cert. denied, 516 U.S. 1014 (1995) (no proof that plea would have been acceptable to judge or that resulting sentence would have been different); *People* v. *Sherman*, 172 P.3d 911, 914 (Colo. App. 2006) (no proof of defendant's willingness to accept plea offer); *People* v. *Palmer*, 162 Ill. 2d 465, 481 (1994) (no proof that State would have offered plea deal).

[21]Our consideration of the defendant's undocumented status in no way implies that an undocumented defendant can never successfully state a claim of ineffective assistance of counsel. New avenues may open in the ever-changing field of immigration law that change the legal landscape for undocumented people. We simply ask that undocumented defendants address the issue of their particular status and how different performance of counsel could have led to a better outcome.

defendant was, in fact, removed from this country following his criminal proceedings. Although plausible, we have been shown no evidence that the defendant's criminal activity made him a more likely target for deportation. The defendant provided no proof that his counsel's conduct as opposed to his undocumented status led to his deportation. See, e.g., United States *vs*. Martinez, U.S. Dist. Ct., Nos. 07-91(5), 10-2553, slip op. at 4 (D. Minn. Dec. 17, 2010) (finding no prejudice because guilty plea had no bearing on defendant's deportability given his undocumented status).

The defendant contends that, had the Commonwealth agreed to a disposition by a plea to simple assault, he would have avoided deportation. This argument also fails for lack of proof. We have been shown no evidence[22] that criminal convictions carry the same deportation consequences for undocumented immigrants as they do for lawful immigrants.[23] The only evidence included in the record is a chart that, even if it were equally as applicable to undocumented immigrants as it is to lawful immigrants, does not advance the defendant's position. The chart indicates that simple assault, like assault and battery causing serious bodily injury, may result in deportation of a noncitizen defendant if the sentence imposed is one year or more. 8 U.S.C. § 1227 (2006 & Supp. II) (aggravated felonies are deportable offenses).[24] See Kesselbrenner & Wayne, *supra* at 3, 4. Therefore, even if the prosecutor had offered a plea to simple assault —

---

[22]Appellate counsel structured the appeal based on the assumption that the undocumented defendant's conviction led to his deportation, and the record, although unclear, suggests that trial counsel acted under a similar assumption. We are under no obligation to accept this unsupported assumption.

[23]The grounds of deportability under Federal statute presuppose that an immigrant was lawfully "admitted." 8 U.S.C. § 1101(a)(13)(A) (2006) (defining "admission" as lawful entry into United States). 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable"). The defendant in this case was not admitted lawfully; he was in this country illegally.

[24]The reason that simple assault and aggravated assault and battery convictions that carry an imposed sentence of one year or more may render a lawful immigrant deportable is that both offenses may constitute "aggravated felon[ies]," defined as "crim[es] of violence," 8 U.S.C. § 1101(a)(43)(F) (2006), or "offense[s] that [have] as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16 (2006). The alternative elements of simple assault in Massachusetts

and there is no evidence that he might have — the defendant well may have faced the same immigration consequence as he did following conviction of assault and battery causing serious bodily injury.

iii. *Failure to advocate for lesser sentence.* We know that a jury convicted the defendant of assault and battery causing serious bodily injury and, therefore, that the judge imposed a sentence based on this conviction. We also know that the defendant was sentenced to two and one-half years in a house of correction, and was required to serve nine months with the balance suspended.[25] We are told by the defendant and his counsel in the form of affidavits that defense counsel did not raise the immigration consequences with the judge for consideration in sentencing. Even taking the affiants at their word, something we are not required to do, we are disturbed by the dearth of proof of counsel's performance at sentencing. The defendant failed to provide a transcript of the sentencing hearing. See *Commonwealth v. Watson*, 455 Mass. 246, 256 (2009). If a transcript was unavailable, the defendant also failed to avail himself of the opportunity afforded in our Rules of Appellate Procedure to file a statement of the evidence. Mass. R. A. P. 8 (c), as amended, 378 Mass. 932 (1979). Consequently, we do not know what factors the judge considered in fashioning the sentence or whether he would have imposed a lighter sentence had the potential immigration consequences been argued to him.[26]

Moreover, we have been shown no evidence that a lighter sentence might have allowed the undocumented defendant to "fly under the radar" and avoid deportation. Even assuming criminal convictions carry the same deportation consequences for undocumented immigrants as they do for lawful immigrants, we have no evidence that deportation would not have been the

— the attempted or threatened use of physical force against the person of another, see *Commonwealth* v. *Gorassi*, 432 Mass. 244, 248 (2000) — mirror the definition of "crime[s] of violence" under Federal statute.

[25] A sentence remains a sentence for immigration purposes, even if its imposition or execution has been suspended in whole or in part. See 8 U.S.C. § 1101(a)(48)(B) (2006).

[26] That the sentencing judge only required the defendant to serve nine months of his sentence does not necessarily indicate a willingness to impose a lighter sentence, even if potential immigration consequences were brought to his attention.

consequence of the aggravated assault and battery conviction, irrespective of the length of the sentence. See 8 U.S.C. § 1227(a)(2)(A)(i). See also Kesselbrenner & Wayne, *supra* at 4 (aggravated assault and battery may qualify as "crime involving moral turpitude" rendering defendants deportable regardless of sentence length).[27] Thus, because the undocumented defendant offered no evidence that his fate would have been different if defense counsel had argued for a lighter sentence, we cannot conclude that he was prejudiced.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

DUFFLY, J. (concurring in part and dissenting in part). I agree with the court that, considered in light of firmly rooted constitutional protections for noncitizen defendants, the defendant has shown that defense counsel's deficiencies deprived the defendant "of the opportunity to make an intelligent decision, based on greater information, about whether to proceed to trial or to request that counsel engage in plea negotiations." *Ante* at 127. In these circumstances, prejudice is shown under an established framework that was set forth by the United States Supreme Court in *Padilla* v. *Kentucky*, 130 S. Ct. 1473, 1485 (2010) (*Padilla*), citing *Roe* v. *Flores-Ortega*, 528 U.S. 470, 486 (2000) (*Flores-Ortega*). A noncitizen defendant who is given inaccurate advice about the immigration consequences of pleading guilty must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla, supra*, citing *Flores-Ortega, supra*.

---

[27]Irrespective of his conviction, the defendant is subject to a term of inadmissibility because he was removed following a period of unlawful presence in this country. 8 U.S.C. § 1182(a)(9) (2006) (inadmissibility of aliens previously removed). Because his sentence was for over one year, and thus his aggravated assault and battery conviction amounted to an "aggravated felony," he may be inadmissible for longer. *Id.* There is also the possibility that he will never be able to return. *Id.* Because we were provided no information about these issues, we cannot conclude that a remand for resentencing would serve the defendant's interests.

This framework also must guide our analysis when counsel's deficiencies consist of failing to "have informed the defendant that the prosecution was interested in discussing a plea resolution" and further failing to "discuss that possibility with the defendant prior to trial." *Ante* at 127.

The court departs from this framework. By requiring that a noncitizen defendant in these circumstances present proof of a specific plea that the prosecutor would have offered, and show that the result of a plea would have been more favorable than the outcome of the trial, the court has imposed a standard more burdensome than that of the United States Supreme Court and thereby has erected a barrier to vindication of a noncitizen defendant's constitutional right to effective assistance of counsel that no defendant in these circumstances reasonably will be able to overcome.

The defendant's submissions establish both that his counsel was ineffective and that the defendant was prejudiced by counsel's deficiencies; I would therefore have allowed the defendant's motion for a new trial, and respectfully dissent.[1]

1. *Prejudice under* Padilla *and* Flores-Ortega. Under the second prong of *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), in order to prevail on a claim of ineffective assistance, a defendant must show that he was prejudiced by counsel's serious deficiency. In *Padilla*, the United States Supreme Court discussed the

---

[1] The court concludes that the defendant's submissions in support of his motion for a new trial establish that his counsel was ineffective in several important respects: (1) counsel failed to provide the defendant information about the immigration consequences of his conviction, *ante* at 124, 126; (2) counsel failed to discuss with the defendant the possibility of plea resolution, notwithstanding his knowledge that the defendant faced possible deportation and that the prosecutor had twice approached him about the possibility of plea resolution, *ante* at 127; and (3) counsel failed to advocate for a lesser sentence, *ante* at 127-128. I concur in this aspect of the court's opinion. I would hold also that defense counsel's failure to enter into plea negotiations with the prosecutor, after the prosecutor twice had expressed interest in plea bargaining, amounted to deficient performance. Under prevailing professional norms, defense attorneys are expected to engage in plea negotiations to attempt to obtain sentences that preclude or ameliorate immigration consequences. See K. Kanstroom & L.M. Glaser, Immigration, in Crime and Consequence: The Collateral Effects of Criminal Conduct § 8.7, at 8-25 (Mass. Cont. Legal Educ. 2d ed. 2009); K. Kanstroom, Immigration Consequences of Criminal Convictions, in Collateral Consequences of Criminal Convictions 19 (Mass. Cont. Legal Educ. 2001).

prejudice prong of a claim that counsel was deficient in advising his noncitizen client about immigration consequence; the Court cited *Flores-Ortega, supra* at 486, in support of its holding that "to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla, supra* at 1485.

The Court's reliance on *Flores-Ortega,* and to the specific citation in that opinion, is telling. The defendant in *Flores-Ortega* alleged that his counsel failed to file an appeal without his consent; the Court held that the applicable prejudice requirement may be satisfied if a defendant shows nonfrivolous grounds for appeal, but a defendant need not " 'specify the points he would raise were his right to appeal reinstated' . . . where there are other substantial reasons to believe that he would have appealed." *Flores-Ortega, supra* at 485-486, quoting *Rodriguez* v. *United States,* 395 U.S. 327, 330 (1969). What is required to show prejudice is that "the defendant demonstrate that, but for counsel's deficient conduct, he would have appealed." *Flores-Ortega, supra* at 486.

A similar framework is described in *Commonwealth* v. *Clarke,* 460 Mass. 30, 47-48 (2011) (*Clarke*). In *Clarke,* we concluded that a defendant who received deficient assistance of counsel at the plea bargaining stage may show prejudice by establishing "the presence of 'special circumstances' that support the conclusion that [the defendant] placed, or would have placed, particular emphasis on immigration consequences in deciding whether to plead guilty." *Id.,* citing *Hill* v. *Lockhart,* 474 U.S. 52, 60 (1985). See *State* v. *Sandoval,* 171 Wash. 2d 163, 175, 176 (2011). That prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill* v. *Lockhart, supra* at 59.[2] Where, as here, counsel's deficient representation included his failure to respond to the prosecutor's

---

[2]We apply a similar approach in the context of motions for a new trial based on claims of newly discovered evidence, where a defendant is not asked to provide proof that a jury provided with the proffered evidence would have

plea overtures, knowing that the defendant faced possible deportation, prejudice is shown if the defendant can demonstrate that, but for counsel's deficient conduct, he would have sought a plea that minimized the risk of the potential consequence of deportation for life. The defendant need not prove that he necessarily would have obtained a better result by plea bargaining than by going to trial.

In its analysis of what it views to be the applicable prejudice standard, the court does not cite *Padilla* and its reliance on *Flores-Ortega* but, instead, concludes that, under *Missouri* v. *Frye*, 132 S. Ct. 1399 (2012) (*Frye*), and *Lafler* v. *Cooper*, 132 S. Ct. 1376 (2012) (*Lafler*), "the defendant must show a reasonable probability that the result of a plea would have been more favorable than the outcome of the trial . . . . In particular, the defendant must demonstrate a reasonable probability that the prosecution would have made an offer, that the defendant would have accepted it, and that the court would have approved it." *Ante* at 129.[3]

*Frye* and *Lafler* do not account for *Padilla*'s discussion of the severe consequence of deportation, see *Padilla, supra* at 1480, 1485, and the fact that a noncitizen defendant's risk assessment includes consideration of the probability that, depending on the criminal charges filed against him, he faces presumptive permanent removal. In this case, as in *Padilla, supra*, the defendant's primary concern was avoiding that severe consequence, which depended not only on the length of the sentence, but also on the nature of the charges. See Roberts, Proving Prejudice, Post-*Padilla*, 54 Howard L.J. 693, 697 (2011) ("disclosure about a severe collateral consequence can radically alter a defendant's risk analysis, and might lead some defendants to take a risk at trial where acquittal or conviction on a lesser charge is the only way to potentially avoid that consequence"). Moreover,

---

found him not guilty. The standard in such circumstances is whether "there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial . . . not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations." *Commonwealth* v. *Grace*, 397 Mass. 303, 306 (1986).

[3]The court appears to add an additional requirement: that the defendant provide "proof that his counsel's conduct as opposed to his undocumented status led to his deportation." *Ante* at 131.

unlike in *Frye* and *Lafler*, as a consequence of counsel's deficient performance, no specific plea offer was made here, and consequently none was ever discussed with the noncitizen defendant.[4]

Thus, *Frye* and *Lafler* do not prescribe the appropriate prejudice standard. Rather, as set forth in *Padilla, supra* at 1485; *Flores-Ortega, supra*; and *Hill* v. *Lockhart, supra*, a noncitizen defendant who faces adverse immigration consequences may establish prejudice by showing that it would have been rational under the circumstances to seek a plea, and that he would have accepted a plea imposing substantial penal consequences if that would have avoided the immigration consequence of deportation with no possibility of return. This showing focuses on a defendant's special circumstances, in particular his immigration status and the consequence of removal, and asks a reviewing court to consider what a rational defendant faced with permanent removal, as compared to a lengthy incarceration should he be found guilty, would have done had he been counseled properly.

Because the focus is not on what a prosecutor and trial judge might have done when considering solely those factors related to the charged crime and appropriate sentencing, "no further showing from the defendant of the merits of his underlying claims" is required. *Flores-Ortega, supra* at 484. Instead, a defendant "must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult him" about whether to engage in plea negotiations, he would have sought a resolution of the charges without trial. *Id.* Under this framework, applicable here, prejudice may be established by evidence of a defendant's statements to his counsel that he wanted to participate in plea bargaining, or the presence of "other substantial reasons to believe" that a defendant would have wanted to engage in plea discussions.[5] *Id.* at 485-486.

*2. The defendant has established a reasonable probability of*

[4]As the United States Supreme Court has recognized, "informed consideration of possible deportation can only benefit both the State and noncitizen defendants during the plea-bargaining process. By bringing deportation consequences into this process, the defense and prosecution may well be able to reach agreements that better satisfy the interests of both parties." *Padilla* v. *Kentucky*, 130 S. Ct. 1473, 1486 (2010).

[5]The defendant states in his affidavit that his attorney never discussed his immigration status with him and "never discussed the immigration con-

*prejudice.* Even under the court's prejudice rubric, the defendant has shown a "reasonable probability that the result of a plea would have been more favorable than the outcome of the trial," *ante* at 129, when "more favorable" takes into account the consequence of permanent removal from the United States. "A reasonable probability is a probability sufficient to undermine confidence in the outcome"; it does not mean "more likely than not." *Strickland* v. *Washington,* 466 U.S. 668, 693, 694 (1984).

That there is a reasonable probability that the prosecutor would have engaged in plea discussions is established, first, by the prosecutor's affidavit, in which he states that he twice sought to engage in plea discussions with defense counsel, at a time when counsel was aware that the defendant faced immigration consequences,[6] and, second, by the widely recognized premise noted by the United States Supreme Court that most criminal cases today are resolved by plea bargaining rather than trials. See *Lafler, supra* at 1388.

Moreover, prosecutors are advised to consider all consequences of a defendant's conviction when deciding whether to enter into a plea agreement. See U.S. Dep't of Justice, United States Attorneys' Manual § 9-27.420(A)(8) (1997); National Dist. Attorneys Ass'n, National Prosecution Standards § 68.1(g), at 191-192 (2d ed. 1991).[7] Under the American Bar Association Standards for Criminal Justice, Prosecution Function and Defense

---

sequences of a conviction for the charges." He thus "did not know that a conviction would likely result in [his] being deported from the United States and never be[ing] able to return to be with [his] family." Had he been advised of the potential immigration consequences of conviction, he "would have requested that [his] counsel engage in plea negotiations and attempt to work out a plea agreement that would not necessarily [have] render[ed] [him] ineligible to remain in the United States" or, if he left, would not necessarily have prevented his return.

[6]According to the prosecutor's affidavit, between October 7, 2009 (the date of a lobby conference), and December 9, 2009 (the scheduled trial date), he discussed with counsel for the defendant and his codefendant "the possibility of resolving their clients' cases prior to trial" but was informed that counsel "would not consider a plea because of immigration consequences for his client." The trial was continued to February 16, 2010. Prior to that date, the prosecutor again approached defense counsel regarding the possibility of resolving the case. Counsel "reiterated that he would not consider a plea to the charges because of immigration consequences for his client." Nothing in the record suggests that the prosecutor ever made any specific offer of a plea.

[7]The President of the National District Attorneys Association has urged

Function, Standard § 3-4.1 (3d ed. 1993), "[t]he prosecutor should have and make known a general policy or willingness to consult with defense counsel concerning disposition of charges by plea." Indeed, this court and the United States Supreme Court have recognized that "the defense and prosecution may well be able to reach agreements that better satisfy the interests of both parties" if all sides are aware of the immigration consequences. *Clarke, supra* at 47 n.18, quoting *Padilla, supra* at 1486.

Based on the foregoing, had defense counsel participated in plea negotiations, there is a reasonable probability that the prosecutor would have been amenable to a plea to lesser offenses, in lieu of assault and battery causing serious bodily injury,[8] in order to avoid the consequences to the defendant of deportation without the possibility of return. See, e.g., K. Kanstroom & L.M. Glaser, Immigration, in Crime and Consequence: The Collateral Effects of Criminal Conduct § 8.7.2, at 8-27 (Mass. Cont. Legal Educ. 2d ed. 2009) (recommending plea to disorderly conduct as alternative to assault and battery).[9] Even if the defendant were to have pleaded guilty to assault and battery causing serious bodily injury, a sentencing recommendation of less than one year would have avoided a conviction for what,

---

prosecutors to consider the immigration consequences of a defendant's conviction "if we are to see that justice is done." Johnson, Collateral Consequences, 35 The Prosecutor, no. 3, May-June 2001, at 5. Prosecutors have a duty to do justice, not to win cases. *Commonwealth* v. *Shelley*, 374 Mass. 466, 472 (1978), quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935) ("the prosecuting attorney 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done' ").

[8]Under G. L. c. 265, § 13A (*b*) (i), "[w]hoever commits an assault or an assault and battery . . . upon another and by such assault and battery causes serious bodily injury . . . shall be punished by imprisonment in the state prison for not more than [five] years or in the house of correction for not more than [two and one-half] years, or by a fine of not more than $5,000, or by both such fine and imprisonment."

[9]Under G. L. c. 272, § 53 (*b*), conviction as a disorderly person, "first offense, shall be punished by a fine of not more than $150. On a second or subsequent offense, such person shall be punished by imprisonment in a jail or house of correction for not more than [six] months, or by a fine of not more than $200, or by both such fine and imprisonment."

under applicable immigration law, constitutes an aggravated felony,[10] and would have ameliorated the consequence of deportation to the defendant.

The record demonstrates that the defendant had a viable defense of defense of another, and that conviction of the offenses charged was far from certain. See, e.g., *Padilla, supra* at 1486 ("a criminal episode may provide the basis for multiple charges, of which only a subset mandate deportation following conviction"). A plea agreement to a lesser offense would have saved the Commonwealth the time and expense of a trial. The prosecutor twice indicated his willingness to bargain, the second time after having learned of the defendant's immigration status. There was thus a reasonable probability that the prosecutor would have accepted such a plea.[11]

Finally, I respectfully disagree with the court's assertion that "[e]vidence that there was no plea negotiation . . . does not establish that there was any real opportunity to avoid the immigration consequences of a conviction, particularly for an undocumented person. The reality of the defendant's status as an undocumented person living in the United States was that he was deportable per se on account of his unlawful status. The defendant was, in fact removed from this country following his criminal proceedings." (Footnote omitted.) *Ante* at 130-131. This assertion does not reflect current immigration law and policies, which are reflected in decisional law, including that of the United States Supreme Court. See *Arizona* v. *United States,* 132 S. Ct. 2492, 2499 (2012). See also *Padilla, supra; Clarke, supra; Commonwealth* v. *Gordon,* 82 Mass. App. Ct. 389, 397-398 (2012). Moreover, the defendant's immigration status as an undocumented alien does not mean that he suffered no prejudice

[10]An "aggravated felony" is a "crime of violence" as defined in 18 U.S.C. § 16 (2006), "for which the term of imprisonment [is] at least one year." 8 U.S.C. § 1101(a)(43)(F) (2006). A "crime of violence" is defined as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another . . . ." 18 U.S.C. § 16(a).

[11]Based on the judge's sentence of nine months to be served in a house of corrections, with the balance of two and one-half years suspended, the record also indicates a reasonable probability — a probability sufficient to undermine confidence in the outcome — that the judge would have been willing to accept a plea to offenses carrying sentences of less than one year.

by being subject to removal for having committed an aggravated felony.[12]

The defendant's status as an undocumented alien rendered him "inadmissible," 8 U.S.C. § 1182(a)(6)(A)(i) (2006), and consequently subject to removal, 8 U.S.C. § 1227(a)(1)(A) (2006), but the fact that a defendant has the status of an inadmissible alien has consequences quite distinct from those he faces if he is also convicted of an aggravated felony. Under 8 U.S.C. § 1228(c) (2006), any noncitizen convicted of an aggravated felony is conclusively presumed to be deportable. The statute directs the Attorney General to provide for "special removal proceedings" for aliens convicted of aggravated felonies, "in a manner which assures expeditious removal following the end of the alien's incarceration for the underlying sentence." 8 U.S.C. § 1228(a)(1) (2006). Once removed, an alien convicted of an aggravated felony may never return to the United States. 8 U.S.C. § 1182(a)(9)(A)(i) (2006).

By contrast, the defendant's status as an inadmissible alien does not mean that he would have been deported on that basis. Even if removal proceedings were commenced because of his inadmissible status, the defendant could have sought discretionary relief under 8 U.S.C. § 1229b(b)(1) (2006 & Supp. VI) on the basis of hardship to his family.[13] See *Commonwealth* v. *Gordon, supra* at 397-398 ("The United States Attorney General generally has the discretion to 'cancel removal,' allowing a noncitizen who is currently a permanent resident to remain in the country, but individuals convicted of an aggravated felony

---

[12]This court may take judicial notice of Federal immigration statutes and the decisional law interpreting and explaining the discretionary manner in which those laws are enforced. See G. L. c. 233, § 70 ("The courts shall take judicial notice of the law of the United States . . . whenever the same shall be material").

[13]Title 8 U.S.C. § 1229b(b)(1) (2006 & Supp. VI) provides that the Attorney General may cancel removal and grant legal permanent resident status to "an alien who is inadmissible or deportable" if the alien (1) has been physically present in the United States continuously for at least the prior ten years, (2) is a "person of good moral character," (3) has not been convicted of certain crimes including crimes of moral turpitude, controlled substances violations, firearms violations, domestic violence crimes, falsification of documents, or aggravated felonies; and (4) can show that removal will "result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence."

are ineligible for cancellation of removal"). If that relief were denied him, the defendant still would have become eligible to apply for a waiver to reenter the United States ten years after his removal. See 8 U.S.C. § 1182(a)(9)(B)(i)(II) (2006). As the defendant's submissions reflect, that option was foreclosed to the defendant upon his conviction of an aggravated felony.

Given the facts of this case, there is also a reasonable probability that no removal proceeding would have been commenced at all were it not for the defendant's criminal conviction. Immigration officials exercise discretion and prioritize the use of limited resources to seek removal of criminal aliens convicted of the most serious offenses.

> "A principal feature of the removal system is the broad discretion exercised by immigration officials. . . . Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal. See [8 U.S.C.] § 1229a(c)(4)[. See also 8 U.S.C.] §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)."

*Arizona* v. *United States*, *supra* at 2499. The discretion that may be exercised

> "embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this [n]ation's international relations. Returning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission."

*Id.*

The United States Supreme Court has also recognized that, in addition to human concerns, there are national concerns that

dictate the use of discretion not to remove an alien. "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire [n]ation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws. . . . Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." Id. at 2498. These national concerns are reflected in the policies that prioritize which aliens will be removed. Id. at 2499.

There are many instances where it is "unlikely that the Attorney General would have the alien removed." Id. at 2508, citing Memorandum from John Morton, Director, Immigration and Customs Enforcement (ICE), to All Field Office Directors et al., Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens 4-5 (June 17, 2011) (ICE Memorandum). As reflected in that memorandum, it is the policy of ICE to prioritize the use of its limited resources "to ensure that the aliens it removes represent, as much as reasonably possible, the agency's enforcement priorities, namely the promotion of national safety, border security, public safety, and the integrity of the immigration system." ICE Memorandum, supra at 2. It does so by exercising prosecutorial discretion "not to assert the full scope of the enforcement authority available to the agency in a given case." Id.

In this case, the record reflects that immigration officials waited until after the defendant was convicted of an aggravated felony to commence removal proceedings.[14] Doing so was not only consistent with stated enforcement policies, but provided for an expedited removal to which inadmissible aliens are not subject. Conviction of an aggravated felony had the consequence of removal without the possibility of cancellation or return, in essence a banishment for life from the country that had been the

---

[14]Docket entries indicate that, at the conclusion of the defendant's trial, on February 25, 2010, the District Court "Received Request for [Facsimile Transmission] Copy of Docket Sheet from Immigration" and that a copy was sent by facsimile transmission on that date. After a notice of appeal was filed, on March 4, 2010, the court "Received via mail a request for both [facsimile transmission] and certified copies from Immigrations & Customs Enforcement." According to the docket, copies were sent by facsimile transmission and certified copies were mailed to Immigrations & Customs Enforcement on the following day.

defendant's home since childhood. Had the defendant been afforded the opportunity, he could have negotiated a plea that, at the very least, would not have had the consequence of removal without any opportunity to return.[15] As the defendant states in his affidavit, he had lived in the United States his entire adult life, and has family members in this country who depend on him; for him, the opportunities to petition for cancellation of removal or a waiver to return would have been "serious benefit[s]." See *Commonwealth* v. *Martinez*, 81 Mass. App. Ct. 595, 596 n.2 (2012).

Even under the framework employed by the court, and unquestionably under the prejudice standard enunciated in *Padilla*, *supra* at 1485; *Flores-Ortega*, *supra* at 486; and *Hill* v. *Lockhart*, *supra* at 59, the denial to the defendant of the opportunity to engage in a plea process, which had a reasonable probability of resulting in an agreement that would have preserved his opportunity to return to the United States — an opportunity more important to this defendant than the length of incarceration — requires that he now be afforded that opportunity.

Because the noncitizen defendant's right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution was denied "at the only stage when legal aid and advice would help him," *Frye*, *supra* at 1408, quoting *Massiah* v. *United States*, 377 U.S. 201, 204 (1964), and he suffered prejudice as a result, the defendant's conviction should be vacated and his motion for a new trial allowed. The defendant, who placed particular emphasis on his immigration status, would then be in a position to participate in the plea phase, informed by the advice of counsel as to potential immigration consequences, and thus able intelligently to consider whether to accept any offered plea or proceed to a new trial.[16]

___

[15]A plea to assault and battery, with a sentence of less than one year, would have achieved that result and, in terms of the period of incarceration actually served, would have been consistent with the sentence imposed after trial.

[16]Allowance of a new trial has been preferred by courts confronted with similar circumstances, because "the remedy of a 'new trial' signifies not only a new trial but also a resumption of plea bargaining." *In re Alvernaz*, 2 Cal. 4th 924, 942 (1992), and cases cited. See, e.g., *United States* v. *Blaylock*, 20 F.3d 1458, 1468-1469 (9th Cir. 1994); *Carmichael* v. *People*, 206 P.3d 800, 809 (Colo. 2009); *People* v. *Curry*, 178 Ill. 2d 509, 536 (1997).